UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket no. 2:19-cr-00030-GZS |
| MICHAEL LIBERTY, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

ORDER REGARDING OBJECTIONS
RE:  ABROGATION OF ATTORNEY CLIENT PRIVILEGE


Before the Court is Defendant Michael A. Liberty's Objections to the Disclosure of Certain

Communications (ECF No. 142).  Defendant has queued up the pending objections pursuant to the

procedure outlined in this Court's February 12, 2020 Order on Pending Motion Re: Abrogation of

Attorney Client Privilege (ECF No. 119) (hereinafter, "Abrogation Order").[1]  As explained below,

the Court OVERRULES the objections presented.



I.      BACKGROUND & PROCEDURAL HISTORY

As this Court explained in its Abrogation Order,

On February 27, 2019, Defendant Michael Liberty ("Defendant" or "Liberty") was
indicted on ten counts including wire fraud, securities fraud, and money laundering as
well as two separate conspiracy counts related to wire fraud and money laundering.  In
addition to Liberty, the Indictment charges one co-defendant, Paul Hess, and also
implicates, "Individual-1," who the Indictment describes as "an attorney at a law firm
in Portland, Maine . . . [who] represented Liberty and various entities controlled by
Liberty."  The Government and Defendant agree that that "Individual-1" is Attorney
George Marcus of the Marcus Clegg law firm.

In relevant part, the Indictment alleges that investors in various Liberty Pass-Through
Companies wired money to Marcus Clegg's Interest on Lawyers Trust Account

---

[1] The Court considers the Abrogation Order incorporated into the current ruling to the extent applicable.

("IOLTA") and that Marcus "caused a substantial portion of these investor funds to be paid to Liberty's friends and family or deposited into accounts controlled by Liberty." More specifically, the Indictment lists "Individual-1," i.e., Marcus, as one of the co-conspirators in the Count One wire fraud conspiracy, which is alleged to have occurred from July 2010 until about 2017.  Marcus is also named as a co-conspirator in the money laundering conspiracy charged in Count Seven, which allegedly took place during the same time period.  Additionally, in three separate counts alleging specific money laundering transactions by Liberty on November 12, 2013, February 10, 2014, and February 11, 2014, the Government charges that the electronic transfers originated from "Individual-1's IOLTA Account."

As part of its investigation, on August 30, 2018, the Government obtained a search warrant for a yahoo.com email address registered to and used by Liberty.  The materials obtained as a result of that search warrant were specifically reviewed by a government filter team that was tasked with screening communications between Liberty and Marcus that were subject to attorney-client privilege.  All told, the filter team reviewed more than 161,000 documents.

(Abrogation Order, PageID #s 2367-68 (internal citations and footnotes omitted).)  In connection with the initial Motion to Abrogate Attorney Client Privilege, the Court received and reviewed fourteen exhibits totaling 347 pages.  (See id., PageID # 2371.)  The Court ultimately ruled that these exhibits were not protected by the attorney-client privilege under the Gorski standard.  See United States v. Gorski, 807 F.3d 451, 461-62 (1st Cir. 2015.)

To the extent that the Government's filter team sought to produce additional documents pursuant to the Abrogation Order, the Court directed "the filter team to first produce to Liberty's counsel any documents or communications that it believes are no longer subject to attorney-client privilege in accordance with [the Abrogation] Order."  (Id., PageID # 2377.)  In accordance with that procedure, the filter team first identified and produced to Liberty's counsel 24,078 documents that it maintained were no longer privileged under the Abrogation Order.

After review, Liberty filed the pending objection identifying approximately 3,500 documents from the filter team's production that he maintained should still be privileged despite

2

the Court's Abrogation Order.[2]  This Court then ordered the Government's filter team to respond

to Liberty's objections and provide the Court with a copy of any document that the filter team

maintained it should be allowed to produce over Defendant's objection.  This process has resulted

in limiting the pending objections to approximately 327 documents, which have been provided to

the Court under seal.  (See Gov't Responses to Defendant's Schedules A, B & C (ECF Nos. 149-

1, 149-2 & 149-3).)  The Court has conducted an *in camera* review of each of the documents to

determine whether they are subject to production under the rulings contained in the Abrogation

Order.[3]  The discussion that follows is limited to whether these 327 documents now before the

Court retain the protection afforded by attorney-client privilege in light of Defendant's proffered

objections.

## II.    DISCUSSION

At the outset, the Court notes that Defendant has presented a "general objection" to what

he describes as a burden shifting dictated by the review procedure described in the Abrogation

Order.  (Def. Obj. (ECF No. 142), PageID # 2725.)  Specifically, he objects to the Court stating

that to justify *in camera* review of any specific additional documents, Defendant would be required

to show that "(1) the . . . document is in fact privileged and (2) that the document falls outside the

crime-fraud exception as delineated in [the Abrogation] Order."  (ECF No. 119, PageID # 2377.)

As suggested by the Government, Defendant's general objection is more properly framed as a

---

[2] As the Government points out taking these objections at face value, there are approximately 20,550 communications as to which Defendant made no objection. See Gov't Response (ECF No. 149), PageID # 2943.  To the extent that Defendant's Reply (ECF No. 153) can be read as attempting to preserve some general objection to the production of these documents based on attorney-client privilege, that objection is overruled.  These 20,550 documents may be produced to the Filter Team under the Court's Abrogation Order.

[3] There are also approximately 3,173 documents identified by Bates range that the Filter Team chose not to pursue further Court review.  The Court expects that these Bates ranges will not be produced and will maintain their status as privileged documents.

request that the Court reconsider this portion of its prior ruling; that request is denied.  (See Gov't

Response (ECF No. 149), PageID # 2932.)  However, the Court notes that the objection is also

moot in that the Court has undertaken an *in camera* review of each document provided to the Court

in connection with Defendant's pending Objections.

Turning to Defendant's "specific objections," Defendant has identified three categories of

documents that he believes should not be subject to production under the Abrogation Order.

(1) "[P]rivileged documents unrelated to Mozido" listed by Bates range in
Schedule A (ECF No. 142-2);
(2) "[P]rivileged documents . . . relating to Attorney Marcus' counsel of Mozido
on corporate matters" listed by Bates range in Schedule B (ECF No. 142-3);
(3) Communications that "involve the legal advice of independent attorneys" listed
by Bates range in Schedule C (ECF No. 142-4).

(Def. Obj., PageID # 2727.)  The Court considers each of these categorical objections in turn.

## A.  Documents Listed in Schedule A

Defendant asserts that the documents he has listed in Schedule A reflect other

representative matters in which Attorney Marcus provided counsel.  In response to Defendant's

assertion that the documents listed in Defendant's Schedule A maintain their privileged status

because they are unrelated to Mozido, the Government's filter team has narrowed the number of

documents it seeks to produce from Schedule A.  It now seeks Court review of 93 communications,

along with 74 related attachments.  (See Gov't Response to Def. Schedule A (ECF No. 149-1).)

The Court initially concurs with the Government that multiple documents in this category

clearly reference "Mozido;" given this, it is not apparent that they can be fairly categorized as

"unrelated" to Mozido.[4]  Other documents, while not apparently referencing Mozido, are not privileged communications in light of the third parties included.[5]

Turning to the remaining Schedule A documents, as the Government correctly argues in its Response, it is not necessary that a document mention or relate to Mozido specifically to fall under the Abrogation Order.  (See Gov't Response, PageID # 2934.)  Rather, there need only be a reasonable basis for concluding that the communications "were intended by [Liberty] to facilitate or conceal" any of the conduct alleged in the Indictment.  Gorski, 807 F.3d at 460.  In terms of corporate entities beyond Mozido, the Indictment explicitly references multiple "Liberty Pass-Through Companies," including Brentwood Financial, LLC and Brentwood Investments, LLC (later renamed BRTMDO, LLC), and Family Mobile LLC, each of were used to facilitate the conspiracies alleged.  (Indictment (ECF No. 1), PageID # 2.)  Additionally, the Government maintains that American Housing Preservation Corporation ("AHPC") is "an entity to which Defendant Liberty transferred hundreds of thousands of dollars raised from victims seeking to invest in Mozido and which is explicitly referenced in Count Three of the Indictment."[6]  (Gov't Response, PageID # 2935.)  Given the allegations in the Indictment, the Court readily finds that

---

[4] See, e.g., Yahoo-SW-001121847, Yahoo-SW-00901746, Yahoo-SW-000805407, Yahoo-SW-000824069, Yahoo-SW-001149671, Yahoo-SW-001149673, Yahoo-SW-00951044, Yahoo-SW-001226807, Yahoo-SW-001226812, Yahoo-SW-001226823, Yahoo-SW-000690353, Yahoo-SW-000690355, Yahoo-SW-00723925, Yahoo-SW-00723926, Yahoo-SW-000778150, Yahoo-SW-000626896, Yahoo-SW-001216321 & Yahoo-SW-001216322.

[5] See, e.g., Yahoo-SW-001076827, Yahoo-SW-000824069, Yahoo-SW-000548232 & Yahoo-SW-000551355.

[6] The Court notes that while Count Three asserts a fraudulent wire transfer of $20,000 on February 12, 2014, it does not explicitly name AHPC. However, Defendant does not apparently dispute the Government's assertion that Count Three involves this particular Liberty-controlled entity.  Rather, Defendant argues that because Count Three "references a discrete transaction" that any abrogation of attorney-client privilege should be limited to that transaction and not include "separate real estate transaction and civil litigations" related to AHPC. Def. Reply (ECF No. 153), PageID # 2983.  However, such a narrow reading of Count Three is not appropriate on a plain reading of the Indictment, which clearly asserts that the wire fraud scheme stretched from July 2010 through 2017 and involved transfers from Marcus's IOLTA account to "Liberty-controlled accounts."  See Indictment ¶¶12, 13, 25, 27.  Given these factual allegations underpinning Count Three, the Court believes that abrogation of the privilege may apply to communications related to AHPC beyond the specific February 12, 2014 transfer.

5

the Abrogation Order applies to information shared between Liberty and Attorney Marcus that involves the Liberty Pass-Through Companies and AHPC during the time period charged in the Indictment.[7]

Additionally, in terms of the fraudulent movement of monies obtained from investors, the Indictment alleges ongoing use of the Marcus Clegg IOLTA account to facilitate the receipt fraudulent investments and to conceal the actual use of the monies received.  (Indictment, PageID #s 11-12.)  By way of example, as documented in some of the communications provided to the Court, there is a reasonable basis for concluding that Liberty communicated with Attorney Marcus to facilitate the transfer of funds in the Marcus Clegg IOLTA account to cover AHPC expenses.[8] Thus, to the extent that some reviewed documents reference or document Liberty directing the movement of funds in and out of this IOLTA account during the time period covered by the Indictment, these documents fall within the Abrogation Order in that there is a reasonable basis for concluding these documents reflect either concealment or facilitation of the alleged fraudulent IOLTA activity charged in the Indictment.  See Gorski, 807 F.3d 451, 461-62.

In short, the Abrogation Order does not require that a particular document or communication contain explicit or implicit references to Mozido in order to fall within the abrogation of attorney-client privilege.  There may well be other evidentiary objections that prompt the Court to exclude one or more of the reviewed Schedule A documents from use at trial.  However, to the extent Liberty has objected to the production as "unrelated to Mozido," the Court

---

[7] To be clear, the abrogation of attorney-client privilege as to AHPC extends to the documents provided that relate to Liberty's dispute with Jim Stanley.  Defendant describes this subcategory of documents as "a private dispute that Mr. Liberty had with AHPC's former CEO concerning assets misappropriated by the CEO."  Def. Reply, PageID # 2983. However, the documents provided for review establish a reasonable basis to believe that both Liberty and Marcus believed there were accounting and funding issues with AHPC as early as 2012.  They also establish that Liberty funded the Stanley dispute with funds from the Marcus Clegg IOLTA account during the time period alleged in the Indictment.  See, e.g., Yahoo-SW-000555350& Yahoo-SW-000892276.

[8] See, e.g., Yahoo-SW-001175629 & Yahoo-SW-001202765.

OVERRRULES Defendant's objections to the production of the Schedule A documents that were

provided for *in camera* review.

### B.  Documents Listed in Schedule B

Next, the Government filter team seeks to produce 33 communications, along with 19

attachments, for a total of 52 documents from Schedule B.  (See Gov't Response to Def. Schedule

B (ECF No. 149-2).)  Defendant categorizes these documents as "related to legal services Attorney

Marcus provided Mozido, LLC and its predecessors, parents, affiliates and subsidiaries – and not

Mr. Liberty personally – with respect to corporate matters such as non-disclosure agreements and

memoranda of understanding, employment and board matters, leases and licensing agreements."

(Def. Obj., PageID # 2728.)  Defendant asserts that the documents "do not relate to the subject

matters of the Indictment." (Id.)

The Court disagrees and readily concludes that all 52 documents may be produced under

the Abrogation Order.  In the Court's assessment, all of these documents overlap with the time

period and subject matter of the Indictment.  Moreover, some of the communications involve

multiple parties, making it hard for the Court to surmise that the communication itself was

privileged when made.[9]

Additionally, implicit in Defendant's stated objection is an assertion that Mozido or some

other corporate entity was Attorney Marcus' client for purposes of the communications in

question.  Assuming that assertion is true, Defendant has not established that he is the current

holder of the privilege.  See, e.g., In re Grand Jury Subpoena, 274 F.3d 563, 571 (1st Cir. 2001)

("[T]he law is settled that a corporation's attorney-client privilege may be waived by current

---

[9] See, e.g., Yahoo-SW-001190273 (Liberty forwarding communication from third party to Attorney Marcus).

management.") (citing <u>Commodity Futures Trading Comm'n v. Weintraub</u>, 471 U.S. 343, 349 (1985)); <u>see also</u> Abrogation Order, PageID #s 2375-76 n.9.

In any event, on the record presented, the Court finds a reasonable basis to believe that any arguably privileged communications contained in the 52 reviewed documents were intended by Liberty to facilitate or conceal the fraudulent activity charged in the Indictment. <u>See</u> <u>Gorski</u>, 807 F.3d 451, 461-62.  Thus, the Court OVERRRULES Defendant's objections to the production of the Schedule B documents that were provided for *in camera* review.

### C.  Documents Listed in Schedule C

The Government has provided the Court with 108 documents from Schedule C that it wishes to produce in accordance with the Abrogation Order.[10]  The Government divides these documents into several subcategories:  (1) communications between Liberty and Attorney Marcus that include advice received from other counsel; (2) communications between Liberty and Marcus where other counsel are copied; (3) communications on which Liberty or Marcus are copied but the communication is primarily to/from outside counsel; and (4) communications that include specific third parties, specifically, Brittany Napier or Erick Abbass.  (<u>See</u> Gov't Response, PageID #s 2937-42.)

The Court first considers the latter category and the issue of the inclusion of specified third parties in certain communication threads.  By way of apparently undisputed factual background, Brittany Napier (aka Britt) married Michael Liberty on April 16, 2016.[11]  Before that date and for

---

[10] While the parties briefing refers to 110 documents, the Court notes that the Government's Response to Defendants' Schedule C includes no document labeled 109. <u>See</u> ECF No. 149-3, PageID # 2975.  Additionally, to the extent the same Response refers to a document labeled 98 (Yahoo-SW-00630965) that document was provided to the Court under label 33 on the Government's Schedule C zip drive.  The Court has not been able to locate, and thus has not reviewed, Yahoo-SW-000630832. <u>See</u> ECF No. 149-3, PageID #s 2969 & 2974.

[11] Because the documents provided for *in camera* review pre-date April 16, 2016, there is no marital communications privilege at issue in these documents. <u>See</u> 3 WEINSTEIN'S FEDERAL EVIDENCE § 505.10 (2020) ("In order for the defendant to assert the confidential marital communications privilege, the court must find that at the time of the

the time period at issue here, she was a manager of some of the Liberty Pass-Through Companies named in the Indictment.  Defendant maintains she was "a direct representative of the client."[12] (Def. Reply, PageID # 2988.) Erik Abbass, the brother of Brittany, worked as Liberty's personal assistant during the time period at issue.  Defendant represents that Abbass "was a necessary conduit for purposes of scheduling calls and meetings between Liberty and independent counsel." (Id.)

"Generally, disclosing attorney-client communications to a third party undermines the privilege." Cavallaro v. United States, 284 F.3d 236, 246–47 (1st Cir. 2002).  It is Liberty's burden to establish that the sharing of any privileged communications with Napier or Abbass did not waive the privilege.  See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) ("[T]he party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and that it has not been waived.")  To do so, he must generally establish that the third party's involvement was "nearly indispensable or serve[d] some specialized purpose in facilitating the attorney-client communications." Cavallaro, 284 F.3d at 249; see also Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 24 (1st Cir. 2011) ("If the communication contains only client confidences made in pursuit of legal advice—or legal advice based on such client confidences—that communication, if intended to remain confidential, should

---

communication there was a marriage recognized as valid by state law."). See generally United States v. Breton, 740 F.3d 1, 9-11 (1st Cir. 2014) (describing the marital communications privilege); United States v. Rakes, 136 F.3d 1, 3-5 (1st Cir. 1998) (describing the marital communications privilege and the application of the crime-fraud exception to that privilege).

[12] It is not apparent whether Defense counsel's reference to "client" is to Liberty himself or the Liberty Pass-Through Companies where Napier was a manager.  If it is a reference to the latter role and the suggestion is that Attorney Marcus was acting in his capacity as counsel for that same corporate entity, the Court again notes that Defendant has failed to establish that he is the current holder of that privilege. See Abrogation Order, PageID #s 2375-76 n.9.

be covered by the privilege, regardless of whether it came from the client, his attorney, or an agent

of either one.")

As to Abbass, Liberty clearly has not met this standard.  Rather, the Court's *in camera*

review of the documents reveals Liberty's ability to keep substantive legal matters confidential

from Abbass.  Specifically, in one 2016 email thread regarding a meeting with the United States

Attorney for the District of Maine, Liberty told Marcus to have Abbass "block dates for Maine

meetings" but "don't tell him what meetings." (Yahoo-SW-001189428.)[13]  Thus, the Court finds

that the inclusion of Abbass on any of the communications provided for *in camera* review waived

any claim of privilege.

As to Napier, the record similarly does not establish that her involvement was

indispensable or necessary to facilitate Liberty's communication with counsel.  However, the

Court notes that Defendant's Reply also makes a reference to Napier sharing "a common interest

with Mr. Liberty with respect to the entities she managed."  (Def. Reply, PageID # 2988.)  "The

common-interest doctrine is typically understood to apply when two or more clients consult or

retain an attorney on particular matters of common interest.  In such a situation, the

communications between each of them and the attorney are privileged against third parties."

Cavallaro, 284 F.3d at 249 (internal quotations and citations omitted).

Given the manager role Napier allegedly played in some of the Liberty Pass-Through

Companies, the common interest doctrine could serve to protect independent legal advice shared

---

[13] The Schedule C documents provided for *in camera* review also include a 2013 admission from Liberty that "people have access to my email" and naming two other specific individuals with access.  See Yahoo-SW-000790747.  While the precise time period that Liberty allowed others to access his Yahoo account is not apparent, the Court notes that allowing this third-party access to communications in his account may provide a separate basis for finding that Liberty waived any personally held privilege to attorney-client communications in the account.  See, e.g., In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d at 22 ("When otherwise privileged communications are disclosed to a third party, the disclosure destroys the confidentiality upon which the privilege is premised.").

between Liberty and Napier related to those entities.[14]   However, similar to <u>Cavallaro</u>, the Court

concludes here that common interest cannot protect any of the documents provided to the Court

for *in camera* review.  Rather, in each of those documents, the Abrogation Order applies to remove

the privilege and any common interest shared by Liberty and Napier "cannot resurrect the

privilege."[15]   <u>Cavallaro</u>, 284 F.3d at 250 (explaining that the addition of a third party sharing a

common interest could not make communications shared with an accountant privileged).  Here,

Defendant has not pointed to a single communication provided for *in camera* review that includes

only Liberty and Napier seeking or sharing advice from independent counsel.  Rather, the Court's

review of the documents finds Attorney Marcus included in each communication in some capacity.

Therefore, the Court turns to the core issue of how the Court's prior abrogation of attorney-

client privilege between Liberty and Attorney Marcus impacts communications with other retained

counsel in the 2010-2017 timeframe covered by the Indictment.  As the Government explains in

its Response, the communications it seeks to produce reflect the work of outside counsel on behalf

of Liberty and his Pass-Through Companies during the applicable time period, but also share the

common thread of an appearance by Attorney Marcus as either a sender, a recipient, or a copied

party.[16]

---

[14] The Court notes that Defendant's common interest argument is not well developed, having been raised via a single sentence in Defendant's Reply.  <u>See id.</u>, PageID # 2988.

[15] <u>See, e.g.</u>, Yahoo-SW-000537944, Yahoo-SW-000541038, Yahoo-SW-000542027, Yahoo-SW-000542691 & Yahoo-SW-000543137.

[16] The Court notes just one partial exception:  Yahoo-SW-000548158.  This exhibit reflects a January 2012 direct communication from Liberty to Attorney Dubow that includes a forward of an earlier email to Attorney Marcus expressing concerns on a similar topic.  The Government's Response describes this one-page, two-email document as "Communication Between Liberty and Marcus," which is an accurate description of only the lower half of the document. (ECF No. 149-3, PageID # 2967.)  On the record presented, the Court declines to find that the Government has established the applicability of the crime-fraud exception to the communication between Liberty and Attorney Dubow.  Therefore, the filter team shall only produce Yahoo-SW-000548158 as a redacted document excluding Liberty's communication to Attorney Dubow.

Having reviewed all of the documents, the Court concludes that the communications between Liberty and Attorney Marcus relaying the substantive inquiries or advice of independent counsel appear to have been intended by Liberty to further or conceal the fraud alleged in the Indictment.[17] Likewise, the forwarding of invoices from outside counsel to secure payment of said amounts furthered or concealed the fraudulent activities charged in the Indictment.[18] The Court's *in camera* review of documents in which either Liberty or Attorney Marcus sent or received communications from outside counsel but also included a copy to each other yields a similar conclusion.[19] In all of these different iterations, while the independent attorneys providing advice or seeking clarification might not have intended to further or conceal any fraud charged in the Indictment, it is clear that Liberty intended to further and conceal the alleged fraudulent scheme charged in the Indictment by keeping his unindicted co-conspirator "in the loop" or seeking to use Attorney Marcus as his messenger.[20] Quite simply, the fraud alleged in the Indictment required the preparation of complex securities documents, and Liberty, with the assistance of Attorney Marcus, obtained legal services to prepare those documents, which was critical to obtaining the investments at issue.

Finally, to the extent Defendant suggests that a communication between Liberty and Attorney Marcus can avoid the Abrogation Order as a result of independent counsel being copied on the

---

[17] See, e.g., Yahoo-SW-00790740; Yahoo-SW-000805628, Yahoo-SW-000805640, Yahoo-SW-000808082, Yahoo-SW-000820098, Yahoo-SW-000549731, Yahoo-SW-001184580, Yahoo-SW-001229719 & Yahoo-SW-000632262.

[18] See, e.g., Yahoo-SW-000769523, Yahoo-SW-000853005, Yahoo-SW-001176900 & Yahoo-SW-000573597.

[19] See, e.g., Yahoo-SW-000438442; Yahoo-SW-000820993, Yahoo-SW-001126619; Yahoo-SW-000552304, Yahoo-SW-000552975; Yahoo-SW-000562432; Yahoo-SW-000572106; Yahoo-SW-001176342; Yahoo-SW-000577726 & Yahoo-SW-000581929.

[20] See, e.g., Yahoo-SW-00531799 (2011 email thread with Liberty positing to Marcus that a then-pending SEC inquiry might end "when they hear we have securities counsel and are doing things right").

communication, the Court disagrees.  The Government's Response cites multiple other district court decisions supporting the proposition that simply copying an attorney on a communication does not make it privileged.  (See Gov't Response, PageID #s 2938-39 & n.2.)  The Court concurs with those cases and concludes that, to the extent outside counsel were simply copied on any of the communications provided for review, that fact does not materially alter the Court's analysis.  Rather, the Abrogation Order, as further clarified here, places such communications within the crime fraud exception.  Having conducted an *in camera* review of the Schedule C documents provided to the Court, the Court OVERRRULES Defendant's objections to the production of these documents with the exception of requiring redaction of Yahoo-SW-000548158.  See *supra* note 16.

### III.   CONCLUSION

As explained herein, Defendant's contested objections are OVERRRULED.  The Government's Filter Team may proceed to produce to the prosecution team: (1) the documents provided to the Court for *in camera* review as described in this Order and (2) the approximately 20,550 communications produced to Defendant in accordance with the Abrogation Order as to which Defendant made no objection.[21]

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 29th day of July, 2020.

---

[21] The Court notes that in at least two instances the Court was provided a single-page PDF indicating that the underlying document was an excel spreadsheet "produced in native format."  See, e.g., Yahoo-SW-000630487 (Doc. No. 97 on Response to Schedule C) & Yahoo-SW-0004011880 (Doc No. 106 on Response to Schedule A).  To the extent the Government filter team intends to produce actual excel spreadsheets to the prosecution team, they will need to provide the Court these documents in the format in which they intend to produce them for further *in camera* review. This Order pertains to the PDFs provided to the Court.